T.C. Memo. 1998-312


UNITED STATES TAX COURT


DONALD KEITH MORLEY AND REBECCA B. MORLEY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19814-94.                    Filed August 24, 1998.


Rodney S. Klein, for petitioners.

William W. Kiessling, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined the following
deficiencies in, and additions to, petitioners' Federal income
taxes:

|  |  | Addition to Tax |
| Year | Deficiency | Sec. 6651(a)(1) |
| 1985 | $6,507 | --- |
| 1986 | 13,877 | --- |
| 1987 | 15,800 | --- |
| 1988 | 14,305 | $3,576 |
| 1989 | 18,027 | 4,506 |

| 1990 | 13,370 | 3,342 |
| 1991 | 10,963 | --- |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: (1) Whether a horse-breeding activity was an activity not engaged in for profit; and (2) whether petitioners are liable for additions to tax pursuant to section 6651(a)(1) for 1988, 1989, and 1990.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the second supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. Petitioners Donald Keith Morley (Mr. Morley) and Rebecca B. Morley, husband and wife, resided in Elizabethton, Tennessee, at the time they filed their petition. During the years in issue,[1] petitioners had three children. Petitioners filed their 1988, 1989, and 1990 Federal income tax returns in April 1990, August 1991, and April 1992, respectively.

Mr. Morley operated a dental practice that was the sole source of income for his family. His dental practice income averaged $128,866.

---

[1] Unless otherwise indicated, all descriptions refer to the 1985, 1986, 1987, 1988, 1989, 1990, and 1991 tax years.

Petitioners did not have a retirement plan. During the years in issue, petitioners placed approximately $6,000 into an IRA account.

In 1985, Mr. Morley met Ed Horton (Mr. Horton). Mr. Horton and his wife owned a horse farm. Mr. Horton had been in the horse-breeding business for many years, and he had an impressive reputation regarding his knowledge of horse business operations and the area horse market.

During 1985, Mr. Horton convinced Mr. Morley that there was great potential for profit in breeding and selling Arabian horses. Mr. Horton showed Mr. Morley how to use Arabian horses to provide a retirement plan.[2]

Mr. Horton assisted Mr. Morley's entry into breeding and selling Arabian horses (the horse-breeding activity). From the inception of the horse-breeding activity, Mr. Morley consulted with other horse breeders and read journal articles about horse breeding. He attended seminars, took courses, and purchased video tapes on breeding Arabian horses and horse farm management. Mr. Morley also did a break-even analysis at the inception of his horse-breeding activity.

In June 1985, Mr. Morley acquired a 34-acre farm (the farm) located approximately 6 miles from petitioners' residence. Mr. Morley conducted the horse-breeding activity on the farm.

---

[2] Prior to 1985, Mr. Morley had no knowledge of breeding Arabian horses.

Petitioners also had a barn at their home that Mr. Morley used for foaling. When mares were ready to give birth to a foal, Mr. Morley moved the mare from the farm to the barn located at petitioners' home. He attached a "monitor" to the mare that would go off when the horse was ready to give birth.[3] When the monitor went off, it signaled a beeper that Mr. Morley carried with him at all times.

Additionally, petitioners had a closed-circuit television system that monitored horses about to give birth. The barn located at petitioners' home contained a camera in the stall with the horse. A separate bedroom in petitioners' home contained a monitor that received the transmissions from the camera. When a horse was about to give birth, Mr. Morley slept apart from his wife in the separate bedroom containing the monitor. When the mare gave birth, Mr. Morley delivered the foal.

In 1985, Mr. Morley purchased two broodmares that were in foal, Sophia and Khola, and a syndicate share of a stallion, T.O. Bolero. T.O. Bolero was a Bask-bred horse.[4] The most Mr. Morley paid for a horse was $10,500. Mr. Morley maintained casualty loss insurance on some of the horses. Between 1985 and 1991, Mr.

---

[3] Horses lie down flat on the ground when they give birth. Horses only lie down to give birth. The monitor detected when the horse lied down, thus signaling the impending birth of a foal.

[4] This means that it was a famous horse.

Morley sold a total of five or six horses. The most he received for a horse was $5,000 plus another horse in return.[5]

Mr. Morley established a separate bank account and maintained a general ledger for the horse-breeding activity. He classified expenses under various categories and provided these figures on a yearly basis to his C.P.A.

Mr. Morley obtained business cards for the horse-breeding activity. Additionally, he designed a logo for his farm which he displayed on materials related to the horse-breeding activity-- banners, jackets, hats, and horse coolers--in order to advertise the horse-breeding activity (the promotional materials). The promotional materials were orange and white--matching the colors of the University of Tennessee.

Mr. Morley maintained extensive books and records on the horse-breeding activity. He used business documents, including bills of sale and security agreements, purchase-and-sale contracts, breeding contracts, and boarding contracts. Mr. Morley's books and records included "teasing" and breeding records on the horses, pedigrees for each of the horses, and veterinarian and health records of the horses. He also kept other records, including bills, from outside organizations that trained the horses.

---

[5] The record does not indicate the value of the acquired horse.

Mr. Morley attended horse shows to learn about the horse-breeding business. He also showed his horses at these events and won several ribbons. After initially hiring a local trainer, Mr. Morley hired a professional trainer to show and care for his horses. Additionally, Mr. Morley maintained a booth at the horse shows displaying the farm logo, the promotional materials, and ribbons that the horses had won.

Mr. Morley made "notices" with information on each of his horses. These notices contained the name, registration number, breed, color, sex, and price of the horses for sale. The notices also contained information on who the horse was "in foal to" (i.e., to whom the horse was bred and when the foal was due).

Mr. Morley advertised the horse-breeding activity in various equine periodicals. He provided notices and narratives about his horses to potential purchasers. He also prepared, for prospective customers, a document containing a cost analysis of raising a horse.

All year round, Mr. Morley worked 4 days a week at his dental practice and 7 days a week on the farm. During the fall, winter, and spring, he spent 40 hours a week at his dental practice and 10 to 20 hours on the horse-breeding activity. In the summer, Mr. Morley worked 40 hours on the farm and 32 hours at his dental practice.

Mr. Morley personally handled many horse-breeding activity duties. He fenced the farm, repaired equipment, cleaned the

barn, ensured security, bathed and fed the horses, and handled all the veterinary work himself.

Prior to engaging in the horse-breeding activity, Mr. Morley spent a lot of time with Mrs. Morley and their three children. Throughout the years in issue, Mr. Morley arrived home after dark, very tired, in a bad mood, and dirty with a "certain aroma" from his work on the farm. Due to his schedule, Mr. Morley ate dinner later than the rest of the family and spent less time with his family.

In 1986, the horse market began to decline. Mr. Morley was unable to sell his foals. Mr. Morley modified his business plan. He expanded the horse-breeding activity to include dealing in horse gestation monitoring equipment, and he displayed literature for the equipment at his horse show booths.

Mr. Morley also took measures to reduce the expenses of the horse-breeding activity. He sold several colts, which were not breeding stallions, instead of incurring the costs associated with maintaining them. Additionally, he leased another farm with a larger barn with more facilities in order to have a more inviting establishment, to attract more people, and thereby sell more horses. This also allowed Mr. Morley to open the farm to board other people's horses.

In 1991, two of Mr. Morley's horses, Khola and Kholetta, disappeared. After a search revealed no indication as to either horse's whereabouts, Mr. Morley assumed that someone had stolen

them.   Several weeks later someone discovered that Khola and Kholetta had fallen into a sinkhole on the farm and died.   These horses had been central to the horse-breeding activity.

Mr. Morley "lost" other horses too.   He leased one horse to a man who kept the horse inside an electric fence.   One night, the man forgot to turn on the electric fence.   The horse escaped, a car hit it, and the horse died.   Additionally, a prize-winning stallion, T.A. Kolero,[6] stepped into a hole and broke its leg. Consequently, Mr. Morley had to put T.A. Kolero to sleep.

On Schedule F, Profit or Loss From Farming, attached to their 1988, 1989, and 1990 Federal income tax returns, petitioners reported gross receipts from the horse-breeding activity in the amounts of $2,229, $3,236, and $5,400, respectively.   On Schedule F attached to their 1985, 1986, 1987, 1988, 1989, 1990, and 1991 Federal income tax returns, petitioners reported net losses from the horse-breeding activity in the amounts of $27,767, $47,387, $52,379, $52,142, $59,266, $41,581, $34,530, respectively.   Losses sustained by petitioners were out-of-pocket economic losses with the exception of amounts deducted for depreciation.

---

[6]  For clarity, we note that T.A. Kolero and T.O. Bolero were different horses.

OPINION

I.  Horse-Breeding Activity

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The U.S. Court of Appeals for the Sixth Circuit, to which an appeal in this case would lie, has held that for a deduction to be allowed under section 162 or section 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary purpose and dominant hope and intent of realizing an economic profit independent of tax savings.  Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989), affg. T.C. Memo. 1988-310; Godfrey v. Commissioner, 335 F.2d 82, 84 (6th Cir. 1964), affg. T.C. Memo. 1963-1.  The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.; see also Campbell v. Commissioner, 868 F.2d 833, 836 (6th Cir. 1989), affg. in part, and revg. in part and remanding T.C. Memo. 1986-569.

Whether the requisite profit objective exists is determined by looking to all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere after-the-fact statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof. Rule 142(a).

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative but rather all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. See sec. 1.183-2(b),

Income Tax Regs.; cf. <u>Dunn v. Commissioner</u>, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

Petitioners contend that the losses from the horse-breeding activity are properly deductible because the activity was profit motivated. Conversely, respondent asserts that the activity was not engaged in for profit. We find that Mr. Morley engaged in the horse-breeding activity with the primary purpose and dominant hope and intent of realizing a profit.

A.   <u>Manner in Which the Activity is Conducted</u>

Relevant factors in determining profit motive include whether the taxpayer: Maintained complete and accurate books and records, conducted the activity in a manner substantially similar to other comparable businesses which are profitable, and attempted changes in order to improve profitability. Sec. 1.183-2(b)(1), Income Tax Regs.

Respondent argues that Mr. Morley failed to operate his horse-breeding activity in a businesslike manner. Mr. Morley kept extensive records. In managing the farm, Mr. Morley used business documents. His books and records for the farm included teasing and breeding records on his horses, self-generated pedigrees for each of his horses, and veterinarian and other types of health records on his horses. He insured the horses that he purchased under contract.

Respondent also points to the fact that Mr. Morley did not create or follow a written business plan, and did not prepare any

written profit or loss statements or balance sheets for the horse-breeding activity. Mr. Morley, however, had a business plan, which was to develop the horse-breeding activity into an enterprise that would support himself and his wife during their retirement years, and he modified the plan in order to reduce expenses and in an attempt to generate a profit. The business plan was evidence by Mr. Morley's actions: Mr. Morley purchased the farm for the horse-breeding activity, bred his horses to produce foals, showed his horses, and advertised his horses for sale. See Phillips v. Commissioner, T.C. Memo. 1997-128.

Mr. Morley maintained an itemized list of expenses and a general ledger for the horse-breeding activity. He also consulted with other horse breeders and educated himself about breeding Arabian horses and horse farm management.[7]

Mr. Morley maintained a separate bank account for the horse-breeding activity. He advertised his horses. Mr. Morley marketed his horses with promotional materials whose color pattern matched those of the University of Tennessee.[8] He

---

[7] We have previously held that a taxpayer's informal and continuous consultations with experts knowledgeable about horses and horse-breeding activities demonstrated the taxpayer's intent to engage in horse breeding for profit even though the taxpayer did not conduct a formal market study. Engdahl v. Commissioner, 72 T.C. 659, 668 (1979).

[8] Mr. Morley testified that he chose the color pattern for his promotional materials because orange and white were the colors of the University of Tennessee, and he lived in "Big Orange" country. We understand his statement about "Big Orange"

(continued...)

provided notices and narratives about every horse to potential purchasers.  Based on the facts of this case, we find that Mr. Morley carried on the horse-breeding activity in a businesslike manner, and this indicates a profit motive.

B.    Expertise of Mr. Morley and His Advisers

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit motive.  Sec. 1.183-2(b)(2), Income Tax Regs.  Respondent argues that the type and quality of advice sought by Mr. Morley was not indicative of an intent to engage in an activity for profit.

Prior to 1985, Mr. Morley had no knowledge about breeding Arabian horses.  Initially, he discussed the Arabian horse-breeding business with Mr. Horton.  Mr. Horton had been in the horse-breeding business for many years and the community regarded him as having a quality reputation for his knowledge of the business operations and the area horse market.  Mr. Horton provided projections to Mr. Morley of the potential profit from the horse-breeding activity.  Additionally, Mr. Horton assisted Mr. Morley's entry into Arabian horse breeding.

Mr. Morley also consulted with other horse breeders and read journal articles for information about horse breeding.  He

[8](...continued)
country to mean that people located in this part of the country are devoted fans of the University of Tennessee.

attended seminars, took courses, and purchased video tapes for information on breeding Arabian horses, equine health care issues, and horse farm management.  He attended horse shows to learn about the horse-breeding business.  He hired professional trainers.  Mr. Morley's consultation with experts and his efforts to educate himself about horse-breeding activities indicate a profit motive.

C.   Personal Pleasure and the Time and Effort
     Spent by Mr. Morley

The fact that a taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit.  Sec. 1.183-2(b)(3), Income Tax Regs.  Respondent concedes that Mr. Morley spent a substantial amount of time on the horse-breeding activity but argues that he derived a significant amount of personal pleasure from the activity.  The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective.  Sec. 1.183-2(b)(9), Income Tax Regs.

Mr. Morley's work on the farm was difficult, and it often precluded him from spending time with his family.  Mrs. Morley credibly testified that she and her children missed her husband and that she would have preferred it if Mr. Morley had been at home instead of working on the horse-breeding activity.  Mr.

Morley arrived home after dark, very tired, in a bad mood, and dirty with a "certain aroma" from his work on the farm. It appeared to the Court that Mrs. Morley resented the amount of time Mr. Morley spent on the horse-breeding activity and that she was unhappy that her husband came home every night dirty and smelly. We are not convinced that Mr. Morley would subject himself to such rigors solely for recreation or pleasure.

Furthermore, the record indicates that, as of the time of trial, Mr. Morley had ridden the horses no more than three times and only in conjunction with his work on the farm. The time and effort Mr. Morley spent on the horse-breeding activity combined with his lack of personal pleasure from the activity indicate a profit motive.

D.    History of Income or Losses

A record of substantial losses over several years may be indicative of the absence of a profit motive. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b)(6), Income Tax Regs., however, provides that a series of losses during the startup phase of an activity may not necessarily be an indication that the activity is not engaged in for profit. Furthermore, if losses are sustained because of unforseen circumstances beyond the control of the taxpayer, then such losses would not be an indication that the activity is not engaged in for profit. Id.

Respondent argues that Mr. Morley's consistent history of losses in the horse-breeding activity is persuasive evidence that he did not expect to make a profit.  Mr. Morley argues that he sustained losses because of unforeseen circumstances beyond his control; i.e., the decline in the horse market, the death of two horses that were central to the horse-breeding activity in a sinkhole accident, and the loss of other horses due to a fatal collision with a car and a broken leg.

We conclude that the financial losses Mr. Morley sustained were the result of unforeseen circumstances beyond his control. Furthermore, during the last few years of years in issue, the losses from the horse-breeding activity had been steadily decreasing.  Additionally, from 1992 through 1995, petitioners' net losses from the horse-breeding activity declined even further to an average of $11,515.  Mr. Morley also testified that in 1996 he made a profit from the horse-breeding activity.  Moreover, we believe that the years in issue encompassed a startup period. See Phillips v. Commissioner, T.C. Memo. 1997-128; see also Engdahl v. Commissioner, 72 T.C. 659, 669 (1979).  As petitioners' losses were sustained during the startup phase of the horse-breeding activity and were the result of unforseen circumstances beyond petitioners' control, we conclude that the losses sustained are not an indication that the horse-breeding activity was not engaged in for profit.

E. Petitioners' Financial Status

Substantial income from sources other than the activity in question, particularly if the activity's losses generate substantial tax benefits, may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.

Respondent argues that Mr. Morley greatly reduced the taxes due from his dental practice income by his reported losses from the horse-breeding activity. Petitioners argue that they and their three children lived a middle class lifestyle. They also point out that they did not maintain a retirement plan or have substantial savings to satisfy their financial needs during retirement.

We have previously stated that it is unconvincing to argue that a taxpayer would spend $1 with the objective of saving a portion of that dollar on taxes. "'As long as tax rates are less than 100 percent, there is no 'benefit' in losing money'." Harrison v. Commissioner, T.C. Memo. 1996-509 (quoting Engdahl v. Commissioner, 72 T.C. at 670). We believe that Mr. Morley engaged in the horse-breeding activity to provide for his and his wife's retirement. Based on these facts, we do not find that this factor indicates that the horse-breeding activity was not engaged in for profit.

F. Conclusion

After reviewing the entire record, we conclude that Mr. Morley engaged in the horse-breeding activity with the primary

purpose and dominant hope and intent of making a profit within the meaning of section 183.

## II.  Failure To Timely File

The section 6651(a)(1) additions to tax for 1988, 1989, and 1990 were based on:  (1) The deficiencies determined by respondent (the deficiency portion); and (2) amounts petitioners listed on their 1988, 1989, and 1990 Federal income tax returns as due and owing (the return portion).  As a result of our holding that Mr. Morley engaged in the horse-breeding activity for profit, petitioners are not liable for the 1985 through 1991 deficiencies.  Therefore, petitioners are not liable for the amounts of the section 6651(a)(1) additions to tax attributable to the deficiency portion.  As the remaining amounts of the section 6651(a)(1) additions to tax are attributable to the return portion, and not to the deficiencies, we have no jurisdiction over these additions.  See sec. 6665(b); Meyer v. Commissioner, 97 T.C. 555, 562 (1991).

To reflect the foregoing,

Decision will be entered

for petitioners.