T.C. Memo. 2021-139

UNITED STATES TAX COURT

MITCHEL SKOLNICK AND LESLIE SKOLNICK, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 24649-16, 24650-16,                  Filed December 16, 2021.
24980-16.

B. Paul Husband, Erin C. Prutow, and Richard W. Craigo, for petitioners.

Kristina L. Rico, Kirsten E. Brimer, Harry J. Negro, Jeannine A. Zabrenski,

and Brian S. Jones, for respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Mitchel Skolnick and Brianna Skolnick, docket No. 24650-16, and Eric Freeman, docket No. 24980-16.

[*2]         MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge: These cases were tried at a special session of the Court in Philadelphia, Pennsylvania, over five days. The main issue for decision is whether petitioners' horse activity, undertaken through Bluestone Farms, LLC (Bluestone or Bluestone Farms), was an activity not engaged in for profit within the meaning of section 183 during 2010-2013.[2] We must also decide whether petitioners may carry forward to the tax years at issue net operating losses allegedly arising chiefly from their horse activity in prior years.

For 2010-2013 the Internal Revenue Service (IRS or respondent) determined deficiencies, additions to tax, and penalties in the following amounts:

<u>Mitchel Skolnick and Leslie Skolnick, docket No. 24649-16</u>

| Year | Deficiency | Late-filing addition to tax | Accuracy-related penalty |
|------|-----------|------------------------------|--------------------------|
| 2010 | $282,036 | $67,026 | $56,407 |
| 2011 | 230,141 | --- | 46,028 |
| 2012 | 189,077 | --- | 37,815 |

---

[2] All statutory references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round monetary amounts to the nearest dollar.

[*3] Mitchel Skolnick and Brianna Skolnick, docket No. 24650-16

| Year | Deficiency | Accuracy-related penalty |
|------|-----------|--------------------------|
| 2013 | $174,664 | $34,933 |

Eric Freeman, docket No. 24980-16

| Year | Deficiency | Accuracy-related penalty |
|------|-----------|--------------------------|
| 2010 | $52,421 | $10,484 |
| 2011 | 38,514 | 7,703 |
| 2012 | 39,478 | 7,896 |
| 2013 | 21,385 | 4,277 |

After carefully considering the facts of these cases and the nonexclusive list of factors set forth in section 1.183-2(b), Income Tax Regs., we find that petitioners' horse activity was not engaged in for profit during 2010-2013. Nor have petitioners properly substantiated the loss carryforwards. We conclude that petitioners Mitchel and Leslie Skolnick are liable for a late-filing addition to tax under section 6651(a)(1) for 2010 but that no petitioners are liable for accuracy-related penalties because they relied on expert advice.

FINDINGS OF FACT

The following facts are drawn from the pleadings, the parties' stipulations of facts with attached exhibits, and testimony and exhibits from trial. When the petitions were filed Leslie Skolnick lived in Pennsylvania, Mitchel Skolnick and Brianna Skolnick lived in New Jersey, and Eric Freeman lived in Florida.

**[*4]**    During 2010-2013 petitioners Mitchel Skolnick and Eric Freeman were co-owners of Bluestone Farms, a horse breeding farm in New Jersey.  Bluestone breeds Standardbred horses, a breed used in competitive harness racing.  Leslie Skolnick was Mitchel's first wife; Brianna Skolnick was his second.  Neither woman had an ownership interest in Bluestone, and both are involved in these cases only because they filed joint returns with Mitchel.

A.    Petitioners' Background

Mitchel has a bachelor's degree from Emory University with a concentration in physics and a master of business administration (M.B.A.) degree from Adelphi University.  In the mid-1980s he formed a successful IT consulting firm that designed and implemented software systems, chiefly for use in accounting.

Allen Skolnick, Mitchel's father, introduced him to the world of Standardbred horses.  Allen owned a very successful vitamin company, Solgar Co., Inc.  In the late 1970s Allen and his wife used a portion of their wealth to create Southwind Farms (Southwind), a Standardbred horse breeding enterprise.  During the 1980s Mitchel occasionally helped out at Southwind, starting with the administration of three horses, and he gradually increased his level of involvement.  By 1996 Mitchel had mostly retired from his software business to become de facto manager at Southwind, where he met many influential people in the Standardbred industry.

[*5] In 1998, after a falling out with his father, Mitchel left Southwind permanently.

Eric was likewise introduced by Allen to Standardbred horse breeding. Eric has a bachelor's degree from Cornell University and an M.B.A. from the University of Virginia. For most of his career he worked in insurance, eventually starting his own brokerage firm. Eric got to know Allen because his firm handled insurance for Southwind and Allen's other ventures. Eric has attended and bet on horse races since childhood, and he enjoyed visiting Southwind to learn about the breeding process.

In 1993 Allen invited Eric to become a part owner of Chancery Equine Group, a syndicate that enabled investors to purchase Standardbred racehorses. Mitchel was also involved in this syndicate. Allen warned Eric that, if he invested in the syndicate, he might lose all his money, but that he would meet interesting people he would otherwise not have met. Eric testified at trial that both predictions proved "prophetic." Chancery Equine Group ended when Mitchel left Southwind.

B.    Founding and Development of Bluestone Farms

As he was leaving Southwind in 1998 Mitchel told Eric that he was thinking of starting his own horse breeding venture and invited Eric to participate. At that point neither man was employed, both having retired after successful careers. Eric

[*6] agreed because he enjoyed the world of horse racing and wanted to get some of his money out of the stock market. On March 17, 1998, Mitchel and Eric cofounded Bluestone Farms as a New Jersey limited liability company. Bluestone is treated as a partnership for Federal income tax purposes and files returns on Form 1065, U.S. Return of Partnership Income.

Bluestone's stated mission was to acquire land and establish a Standardbred breeding farm that would sell high-quality yearlings at respected public auctions. (A horse is called a "yearling" during the calendar year after it was born.) Year-lings not sold would be retained as broodmares (female horses held for breeding), with the goal of increasing the quality of Bluestone's broodmare band and of future yearlings. Bluestone also planned to earn income by selling breeding rights to any successful stallions it acquired.

Mitchel found the breeding aspect of the new venture especially appealing. Horse breeding, particularly the decisions owners must make about which horses to breed with which, involves statistics and research into horse pedigrees. Mitchel enjoyed this type of analysis, which employed skills resembling those he had de-veloped in designing computer systems.

At the outset of their venture Mitchel and Eric drafted a business plan and a budget. They planned to buy a stallion, raise revenue by breeding the stallion and

**[*7]** boarding other owners' horses for a fee, and then buy additional horses. If everything went according to plan, they projected that Bluestone would make a small profit during each of its first three years.

On March 21, 1998, Mitchel and Eric paid $559,000 to purchase a 60-acre former dairy farm at 195 Pennington-Hopewell Road in Hopewell, New Jersey. No document in the record specifies the initial financial arrangements between the two men. At trial neither could remember the amount of his original contribution or whether their contributions were equal. But at the time they understood themselves as being essentially co-owners.

Mitchel and Eric hired a full-time farm manager, Brenda Clawges, who moved into an apartment on the property to facilitate easy access to the horses. They also hired someone to maintain the property. In those early years Mitchel commuted to Bluestone from his home in Newton, Pennsylvania, where he lived with his first wife, Leslie. Eric split his time between his homes in Florida and New Jersey. Because Eric spent half the year in Florida, he was not deeply involved in the farm's day-to-day operations.

Mitchel and Eric paid for extensive landscaping and improvements to the farm. They paid to clear the land, plant trees, build a barn, add horse paddocks, and install automatic watering systems. As Mitchel explained during trial:

[*8] "You're selling quality products, you want your farm to look really good." The bills began to mount. In 2000 Mitchel returned to work at the IT consulting firm because he believed he could not handle Bluestone's expenses otherwise.

Mitchel and Eric prepared a second business plan in August 2000. This resembled the first but expressed hope that Bluestone could supplement its income by racing horses and winning purses or breeders awards (cash prizes given to a person who bred the winning horse, while not necessarily owning it when the race occurred). Bluestone had been unprofitable in its 18 months of operations. Their initial optimism perhaps now tempered, Mitchel and Eric updated their budget to project operating losses of $132,235 in 2000 and $166,648 in 2001. But they projected a small profit in 2002.

In late 2000 Mitchel and Eric brought in Frank Russo as a third partner in Bluestone. At that point Mitchel and Eric were no longer equal partners. There is no documentation as to how or when that change in ownership occurred, and there is no record of the financial arrangements or transactions that led to it. But for whatever reason, an agreement executed on January 1, 2001, stated that Mitchel owned 75% of Bluestone and Eric 25%. Mitchel then conveyed a 15% membership interest to Frank for $325,000. Following that transaction, Mitchel owned

[*9] 60% of Bluestone, Eric 25%, and Frank 15%. Frank was a passive investor and did not have a meaningful role in Bluestone's operations.

Although Bluestone was still losing money, it expanded its operations by purchasing a second property (Wert Farm) in September 2002. The Wert Farm is at 15 Mine Road, about a third of a mile from the original property. The new property, likewise a former dairy farm, occupied 30 acres and cost $850,000. Mitchel and Eric immediately began developing that property by adding horse paddocks, repairing a farmhouse, replacing electrical wiring, and installing an automatic watering system.

Bluestone's third business plan, drafted in February 2003, included a note from Mitchel to his partners about their disappointing yearling sales: "Well, do you think I could have done any worse?" That plan nevertheless projected a profit for 2003 and larger annual profits in 2004-2006. Bluestone in 2003 actually recorded a loss in excess of $630,000, its second largest annual loss to date. Despite that loss Bluestone's fourth business plan, drafted in February 2004, made similarly optimistic projections.

In 2003 Mitchel retired (for a second time) from his IT consulting business and redirected his attention to horse breeding. About that time he began receiving distributions from a trust fund set up by his parents. The distributions came in

**[\*10]** increments of several million dollars. By 2010 he had received roughly $10 million from the trust.

The 2004 budget and business plan were the last that Bluestone ever created. But its operations continued to expand. A new office, well, and septic system were built in 2006, and three ponds were restored. In 2007 Bluestone purchased its third parcel of land, another former dairy farm, adjacent to the second farm. This property, known as Rosenthal Farm, occupied 200 acres--more than double the acreage of the first two properties combined--and cost $4 million. Bluestone again paid to clear the land, build paddocks and roads, repair the barn, and add an automatic watering system.

Mitchel testified at trial that Eric was the driving force behind the Rosenthal Farm purchase because Eric was "always wanting more, and more, and more mares." But Eric did not want to put more money into the venture. In lieu of making an additional capital contribution to purchase the land, he reduced his membership interest to 15% by conveying a 10% interest to Mitchel. This change in ownership was not memorialized in writing until 2017--well after the IRS had commenced its examination of petitioners' returns--when Bluestone's members executed a document entitled "Ratification of Actions." In any event, as of early

[*11] 2007, Mitchel viewed himself as holding a 70% membership interest in Bluestone, with Eric and Frank each holding 15%.

The conventional wisdom in the Standardbred industry is that owners need roughly two acres of land per horse. Bluestone's purchase of the Wert and the Rosenthal Farms would thus have enabled it to expand its broodmare band significantly. But that never happened.

In 2004 Pennsylvania passed legislation allowing slot machines at its racetracks, something that was prohibited in New Jersey. A portion of the new slot machine revenue went to increasing the size of Pennsylvania racing purses and breeder's awards. In 2009 Pennsylvania tightened the eligibility rules for its breeder's awards so that horses could qualify only if physically present in that State for at least 180 days of the year.

These and other competitive pressures from neighboring States were disadvantageous for New Jersey horse farms, inducing many horse owners to move their horses from New Jersey to Pennsylvania or elsewhere. In 2009 New Jersey started spending $30 million annually to support its farms, but in 2012 the governor ended the subsidy. These developments coincided with the 2008 financial crisis and ensuing recession, which hurt the market for Standardbred horses overall.

[*12] In part because of these adverse developments, Bluestone did not expand its resident broodmare band. Quite the contrary: it too moved horses away from its farm and started boarding them in other States, hoping to take advantage of their breeders awards and certain restricted-entry races.

In 2009 Bluestone entered into a co-venture arrangement with Cane Run Farm, a well-respected Standardbred farm in Georgetown, Kentucky. Its farm manager, Elizabeth Caldwell, believed that she and Mitchel had similar breeding philosophies and that their farms would benefit by splitting the cost of purchasing certain horses instead of bidding against each other. Some of the horses purchased through this arrangement were boarded at Bluestone part time, but others were boarded in Kentucky or Pennsylvania. When a yearling was old enough Cane Run prepared it for sale, a process that takes a minimum of two months. The number of horses the two farms co-owned grew over the years at issue: 8 in 2010, 12 in 2011, 15 in 2012, and 18 in 2013. Generally, these horses ended up being somewhat more successful financially than the horses Bluestone purchased on its own.

During 2010-2013 the Wert and the Rosenthal Farms were underutilized. Bluestone added paddocks to about 40 of the 200 acres on the Rosenthal Farm but let a friend grow hay on half of the land for free. One of their employee's sons was permitted to use the barn to store equipment for his landscaping business, again for

[*13] free. Bluestone used a portion of the property occasionally to graze horses, but this use was sporadic.

Beginning in 2011 Bluestone took steps to investigate sale of the Wert and the Rosenthal Farms, neither of which was contiguous to the original property. It retained an engineering firm to prepare a topographical survey and a feasibility study directed to subdivision and development of the two farms. It hired a law firm to assist with the technical aspects of subdividing the properties.

In 2012 Bluestone entertained an offer from Toll Brothers, a major developer, to purchase the Wert and the Rosenthal Farms, but no sale was consummated because Mitchel and Eric held out for a higher price. In 2013 Bluestone was approached by a land preservation group that offered to purchase the building rights on the farmland. Bluestone also declined this offer.

C.    Mitchel's Residence at Bluestone Farms

In 2008, after separating from his first wife, Mitchel moved his residence to Bluestone Farms. Brianna moved in with him in April 2009. They continued to live on the property, rent-free, during 2010-2013. There was never any formal agreement among Bluestone's partners regarding the financial consequences of their doing so.

[*14] Mitchel and Brianna initially resided in an apartment above the farm office and immediately began extensive renovations to the original farmhouse. Mitchel engaged Hopewell Valley Engineering (HVE) to devise plans for the renovation. The original stone farmhouse was dismantled piece by piece and many of its elements were incorporated into the new structure. Bluestone paid all of the invoices that HVE submitted for this renovation; the record is unclear as to whether Bluestone or Mitchel paid the actual construction costs. Mitchel and Brianna moved into the renovated farmhouse upon its completion in 2010.

During 2010-2013 Bluestone paid, on the three farm properties, aggregate mortgage interest exceeding $190,000, aggregate real estate taxes exceeding $225,000, and aggregate utilities expense exceeding $100,000. Bluestone made no effort to ascertain the portion of these expenses attributable to Mitchel's personal residence. Mitchel did not reimburse Bluestone for any of the mortgage interest, real estate taxes, or utilities expense attributable to his personal residence during 2010-2013.

During 2011-2013 Bluestone paid aggregate landscaping expenses of $200,340. Much of this work was performed by Szul's Landscaping, and its invoices show that about half of the landscaping work directly benefited Mitchel's personal residence. These expenses included the costs of bringing in boulders,

[*15] constructing a waterfall, and planting trees and flowers around the residence; the costs of labor, machinery, and boulders to excavate a pond near the residence; charges for building and landscaping pond shelves; and the costs of labor, design, and supervision involved in creating a drainage system at the driveway entrance leading to the residence. Mitchel did not reimburse Bluestone for any of these landscaping costs.

Mitchel and Brianna were married at Bluestone on May 30, 2013. Szul's Landscaping did extensive work around Mitchel's residence on May 15-17. It subsequently invoiced Bluestone $35,237 for landscaping related to the wedding, installing uplighting on the patio behind the residence, creating a drainage system to control flooding around the patio, and power-washing the patio around a pond. Mitchel did not reimburse Bluestone for any of the landscaping costs incurred in connection with his wedding. At trial he characterized the landscaping expenses as "minor costs" to which his partners would not object because he owned 70% of Bluestone.

D.    Bluestone's Operations and Petitioners' Involvement During 2010-2013

Bluestone's farm manager, Brenda Clawges, saw Mitchel about once a day during the tax years at issue. He usually worked in the office, but he occasionally helped out (for example) by feeding the horses if Ms. Clawges was unavailable.

[*16] His responsibilities included reviewing monthly bills and financial reports, signing checks, balancing checkbooks, answering emails, talking to customers, meeting with the veterinarian, and monitoring the breeding process. He kept up to date with harness-racing news and was a member of several Standardbred organizations. He wrote several articles about the Standardbred industry, including a 2007 opinion piece urging that New Jersey's subsidies for the industry were too low. He does not ride horses recreationally.

Eric handled all of Bluestone's insurance needs but had little involvement in its day-to-day operations. He occasionally accompanied horses to races, attended related social events, and read news publications about harness racing. During the six months he was in New Jersey, he went to Bluestone a few hours every week. Both he and Mitchel were involved in decisions about which horses to buy and sell.

During 2010-2013 the number of horses in which Bluestone had a full or partial ownership interest ranged from 65 to 84 annually. Between 10 and 15 of the horses were mares used chiefly for breeding; between 12 and 15 of the horses were used for racing; and the remainder were mostly yearlings or weanlings (horses younger than a year). Bluestone also grazed, boarded, and fed about 10 retired horses that had no economic value but were kept for sentimental reasons.

[*17] Fewer than half of the horses in which Bluestone had an interest actually lived on the farm property. During 2010-2013 the number of horses physically present on the property (including retired horses) usually ranged from 20 to 25. The other horses were kept by their co-owners, were boarded at farms in other States, were being prepared for sale in Kentucky, or were sold midyear. Bluestone owned a part interest in a successful stallion, "Always a Virgin," but it was kept in Indiana.

Bluestone had between 7 and 10 employees during 2010-2013, some full time and some part time. Mitchel nominally supervised these employees, but they set their own schedules and worked largely independently. Brenda Clawges, the original farm manager, explained that her interactions with Mitchel were usually limited to letting him know that something needed attention or repair or that she was leaving the property to purchase something. Kelly Detweiler, a former employee who eventually became office manager, explained that she rarely interacted with Mitchel. When she did, their interactions were usually brief.

Some employees worked with the horses directly, by feeding them, transporting them to the racetrack or other farms, ordering supplies, monitoring the mares' fertility, scheduling veterinary appointments, assisting the veterinarian with insemination, foaling mares, and preparing yearlings for sale. Employees also kept

[*18] health and billing records, organized travel arrangements, and kept records showing horses' eligibility for particular races and breeder's awards. Other employees were responsible for groundskeeping and maintenance.

Bluestone had a website, maintained by a contractor, with a searchable data-base of Bluestone yearlings previously sold at auction. Bluestone paid a veterinar-ian to visit the farm every day during breeding season; it hired two professional trainers, Bob Stewart and Joe Halloway, to work with the racehorses; and it paid a staking company to "stake" the horses, a process of making periodic payments to keep young horses eligible for races. Bluestone also engaged a certified public accountant (C.P.A.) to prepare its tax returns.

Before selling a horse at auction, Mitchel and Eric consulted with Robert Boni (owner of Northwood Bloodstock Agency) and David Reid (president and chief executive officer of the Lexington Selected Yearling Sale). They typically hired Mr. Boni's agency to sell yearlings on their behalf. His agency helped ad-vertise the horses, e.g., by putting together pedigree pages for sales catalogs and making videos of horses for prospective buyers.

Bluestone had an ultrasound machine on the property, a microscope for ex-amining stallions' semen, and a counter to determine the quality and motility of the sperm cells in the semen. It had commercial accounting software to track its

[*19] finances, including a general ledger, and specialized horse management software with the capacity to track income and expenses by horse. It carried mortality insurance on its horses and liability and property damage insurance on its farmland. Bluestone and its partners had separate bank accounts.

Bluestone's partners invested heavily in the farm but did not prioritize cost cutting in its daily operations. Kelly Detweiler, the former office manager, suggested cost-saving options to Mitchel, but he rarely followed up on her suggestions. He explained that this type of cost cutting was not a priority because he had never viewed his horse activity "in terms of income and expenses." Instead, he saw Bluestone's horses as an asset whose value would increase over time.

Although Bluestone had the tools to keep accurate financial records, it did not always do so. Transactions between Bluestone and its partners were often not documented. The partners subsidized Bluestone's losses by making contributions in the form of capital injections or loans; they did not differentiate between the two. Contributions were not always made ratably to each member's ownership interest, and no partner was ever forced to make an additional contribution to keep the relative contributions stable. For years after 2004 Bluestone did not prepare budgets or maintain balance sheets, profit-and-loss projections, or break-even analyses.

[*20] Using its specialized horse software, Bluestone had the capacity to keep detailed "Procedure Reports" tracking data by horse, including the total cost for owning each horse. But Bluestone often did not maintain these records accurately. In some Procedure Reports it showed as income received the reserve price it had set at a failed auction, even though that amount was never paid because Bluestone had decided to keep the horse. Items like breeder's awards were not always labeled appropriately or sorted into the correct account. A few horses were missing from the Procedure Reports altogether. The general ledger had what seem to be redundant categories--e.g., "Stud Fees Income--AAV" (account ID 10080), "Stud Fees Always a Virgin" (account ID 10085), and "Stud Fees Always a Virgin" (account ID 10086)--all of which relate to the same horse. These inaccuracies and inconsistencies were not of great concern to Mitchel, who testified that he nevertheless found these records a useful management tool.

Brianna, Mitchel's second wife, lived with him at Bluestone during the years at issue. She is an equine artist, has a trainer's license, and owns Standardbred horses. Although she played no formal role in Bluestone's operations, as early as November 2011 she had a Bluestone business credit card. She used this card for personal expenses on several occasions, including the purchase of clothing at Jean Machine and Nine West.

[*21] Brianna rides horses recreationally. Bluestone paid the costs of widening a walking trail in the woods to make the trail suitable for her equestrian use. She brought most of her horses with her when she moved to Bluestone, and Bluestone paid the expenses of keeping her horses during 2010-2013. Those expenses totaled $77,698 (offset by $5,136 received from the sale of one foal). Mitchel explained at trial: "Because I love Brianna, I don't charge her for any of these horses."

E.      Bluestone's History of Income and Losses

On its Forms 1065 for tax years 1998-2009, Bluestone reported on line 22 an "ordinary business loss" for every year, in the following amounts:

| Year | Income/loss |
|------|-------------|
| 1998 | ($109,677) |
| 1999 | (139,251) |
| 2000 | (337,738) |
| 2001 | (456,409) |
| 2002 | (641,463) |
| 2003 | (632,821) |
| 2004 | (611,347) |
| 2005 | (578,200) |
| 2006 | (841,664) |
| 2007 | (1,023,281) |
| 2008 | (1,451,184) |
| 2009 | (1,102,486) |
| Total | (7,925,521) |

As this table shows, Bluestone's losses generally got bigger, not smaller, over time.

[*22] During 2010-2013 Bluestone had three main sources of potential income:
horse sales (selling yearlings and any horses that were culled), income from racing
the horses (in the form of purses or breeder's awards), and stud fees (selling the
rights to breed with a stallion). During this period Bluestone generated gross in-
come from these sources as follows:[3]

| Year | Sales | Purses | Breeders awards | Stud fees |
|------|-------|--------|-----------------|-----------|
| 2010 | $584,470 | $286,974 | $31,449 | $141,267 |
| 2011 | 365,986 | 317,796 | 22,947 | 117,661 |
| 2012 | 330,446 | 411,355 | 11,069 | 60,807 |
| 2013 | 299,085 | 139,945 | 46,209 | 32,203 |

For each year at issue, however, Bluestone incurred expenses that ranged from
150% to almost 300% of its income. On its Forms 1065 Bluestone reported on
line 22 ordinary business losses for 2010-2013 as follows:

| Year | Income/loss |
|------|-------------|
| 2010 | ($510,223) |
| 2011 | (916,848) |
| 2012 | (993,066) |
| 2013 | (1,083,959) |
| Total | (3,504,096) |

---

[3] Bluestone also received miscellaneous income of various types. There are
discrepancies in the record regarding its respective sources of income, in large part
because Bluestone's financial records, while voluminous, are sometimes incom-
plete, inconsistent, or hard to decipher.

[*23] F.     Post-2013 Results

During 2014-2017 Bluestone continued to report losses.  The number of horses Bluestone kept on its three farm properties remained low.  In late 2015 Brenda Clawges, the longtime farm manager, left her position because there were no longer enough mares to foal.

On its Forms 1065 for 2014-2017 Bluestone reported, on line 22, ordinary business losses as follows:

| Year | Income/loss |
|---|---|
| 2014 | ($976,657) |
| 2015 | (710,327) |
| 2016 | (480,851) |
| 2017 | (992,868) |
| Total | (3,160,703) |

"Ordinary business losses," as reported on line 22, do not include section 1231 gains or losses, i.e., gains or losses from the sale or exchange of assets used in the taxpayer's trade or business.  For 2016 Bluestone managed to show a slight profit when section 1231 transactions are factored in.

In 2013 Bluestone had purchased, for about $50,000, a stake of 35% (later increased to 55%) in a racehorse named Always B Miki.  That horse began racing as a two-year-old in 2013 and went on to have great success as a racehorse, achieving total racing earnings of $2.7 million.  After Always B Miki retired, his owners started selling the right to breed with him.  He generated approximately $600,000

[*24] from stud fees in 2016, which was split among his owners. Always B Miki did not live on the Bluestone property.

In 2016 Bluestone sold a 25% stake in Always B Miki for $1.2 million. The section 1231 gain it reported on that sale, coupled with its share of the horse's stud fees in 2016, enabled it to report a modest overall profit in that year. Bluestone's net income/loss reported on Schedule K, Partners' Distributive Share Items, as reported on its Forms 1065 for 2014-2017, was as follows:

| Year | Sch. K income/loss |
|------|--------------------|
| 2014 | ($1,017,777) |
| 2015 | (721,226) |
| 2016 | 281,450 |
| 2017 | (850,405) |
| Total | (2,307,958) |

Over the years, the difference between the aggregate losses Bluestone reported as "ordinary business losses" on line 22 and those it reported as "net business losses" on Schedule K was relatively minor. For the 20-year period beginning in 1998 and ending in 2017, Bluestone reported total ordinary business losses of $14,590,320 and total Schedule K net losses of $13,549,551.

G.     Tax Filings and Notices of Deficiency

Bluestone filed partnership tax returns for every year from 1998 onwards. Its returns were prepared by Jay Nathan, a C.P.A., who also prepared Mitchel's personal tax returns. Mr. Nathan has an M.B.A. from Hofstra University and has

[*25] been an accountant for several decades. His firm had performed services for two other horse farms before he began working with Bluestone.

Mr. Nathan reviewed Bluestone's general ledger and other records, searched for items that needed to be reviewed or reclassified, then used the amended records to prepare Bluestone's and Mitchel's tax returns. If he had questions or needed additional records, he spoke to Mitchel. Mr. Nathan advised Mitchel that the ongoing losses passed through to him from Bluestone were properly deductible. Because of these losses, Mitchel reported large net operating losses (NOLs) and a total tax liability of zero for 2010, 2011, 2012, and 2013.

Mitchel's returns for 2011-2013 were timely filed, but the return he filed jointly with Leslie for 2010 was not. That return was due by April 15, 2011, but it was not filed until April 10, 2012. Mr. Nathan deferred preparation of that return until after the filing deadline because he was busy with other work. He explained that filing the return was not a priority because there was no balance due.

Eric's returns for 2010-2013 were prepared by John L. Tomlinson, a C.P.A. who had prepared Eric's returns since 1998. Mr. Tomlinson has a master's degree in accounting from the University of Miami and has worked as an accountant since 1974. Eric provided Mr. Tomlinson with the Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., he received from Bluestone. Mr. Tomlinson

[*26] advised Eric that his ongoing losses from Bluestone were properly deductible. Eric reported for each year a large NOL and a tax liability of zero or close to it.

Before the IRS opened its examination for the tax years at issue, it had examined Bluestone's partnership return for 2008. That examination, in which Mr. Nathan represented Bluestone, resulted in no adjustments for Bluestone or its partners. The 2008 examination did not address the question whether Bluestone was operated with the intent to make a profit.

In 2014 the IRS selected Mitchel and Leslie's 2012 return for examination, and the audit grew to encompass petitioners' returns for 2010 through 2013. On March 18, 2015, Revenue Agent (RA) Mary Krause, who completed the examination, made the initial determination to assert accuracy-related penalties against Mitchel and Brianna for 2013 and against Eric for 2010-2013. Two days later RA Krause made the initial determination to assert accuracy-related penalties against Mitchel and Leslie for 2010-2012.

On March 23, 2015, the IRS mailed 30-day letters to each petitioner. Each letter included a revenue agent report (RAR). These letters were the first formal communication to petitioners of the IRS' determination to assert penalties against them. Group Manager Robert Grosso, the immediate supervisor of RA Krause,

**[\*27]** signed each 30-day letter before it was mailed. His practice before issuing a 30-day letter is to review the case file, examine the 30-day letter, and sign the letter only if he has approved the determinations set forth therein.

On August 31, 2016, the IRS issued a timely notice of deficiency to each petitioner. They timely petitioned this Court. The cases were later consolidated for trial, briefing, and opinion.

H.    Expert Testimony

We filed an earlier opinion granting respondent's motion in limine to exclude the expert report of David Reid, one of petitioners' proposed witnesses. See Skolnick v. Commissioner (Skolnick I), T.C. Memo. 2019-64, 117 T.C.M. (CCH) 1319. We heard testimony from five other expert witnesses after excluding portions of certain reports as irrelevant, outside the scope of their expertise, or invasive of the province of the Court.

1.    Russell C. Williams

Mr. Williams is chairman and president of Hanover Shoe Farms, the largest breeder and seller of horses in North America. He is chairman of Standardbred Horse Sales Co., which operates an auction in Harrisburg, Pennsylvania, and president of the U.S. Trotting Association, the governing body for U.S. Standardbred

[*28] racing. We recognized him as an expert in the business structure of the Standardbred industry, including auctions and stallion syndicates.

2. Robert Boni

Mr. Boni is a bloodstock agent with 35 years' experience in the Standardbred industry. We recognized him as an expert in bloodstock agency practices, the benefits derived by breeders and owners from using a bloodstock agent, and sales practices within the Standardbred industry. Mr. Boni also testified as a fact witness about his personal interactions with Mitchel and Bluestone.

3. David GaNun

Mr. GaNun is a New Jersey certified real estate appraiser who specializes in farm appraisals. We recognized him as an expert in appraisals of farm properties.

4. Kathy Parker

Ms. Parker is the editor and general manager of a company that publishes The Horseman and Fair World magazine. Her company operates Harnessracing.com and HarnessRacing Weekend Preview, a digital newsletter. We recognized her as an expert in advertising and media in the Standardbred industry.

5. John Daniel Curtin

Mr. Curtin is the owner of a New Zealand-based company that transports harness-racing horses from Australia and New Zealand to the United States and

[*29] Canada.  He founded harnesslink.com, a news website for Standardbred enthusiasts.  We recognized him as an expert in Standardbred horse sales, "stallion shuttling," and the breeding, raising, and valuation of Standardbred horses.

OPINION

The main issue for decision is whether petitioners' horse activity during 2010-2013 was not engaged in for profit within the meaning of section 183.  After addressing that question,[4] we will consider whether petitioners are entitled to NOL carryforwards and whether they are liable for penalties or additions to tax.

A.    Burden of Proof

The taxpayer generally bears the burden of proving that the requisite profit objective exists.  See Rule 142(a); Westbrook v. Commissioner, 68 F.3d 868, 876 (5th Cir. 1995), aff'g T.C. Memo. 1993-634.  Under section 7491(a) the burden of proof on factual issues may shift to the Commissioner where the taxpayer satisfies certain requirements.

---

[4] In his posttrial brief respondent urged that Eric cannot deduct horse-related losses in any event because he did not "materially participate" in Bluestone.  See sec. 469.  But the notice of deficiency issued to Eric did not mention "material participation" as an alternative ground for disallowing his losses, and it was not mentioned in respondent's pleadings, so this argument was not properly raised.  See Pagel, Inc. v. Commissioner, 91 T.C. 200, 211-212 (1988), aff'd, 905 F.2d 1190 (8th Cir. 1990).  On September 17, 2019, respondent moved to amend his answer to allege this new ground.  We denied that motion.

[*30] Petitioners stated in their pretrial memorandum that they intended to show at trial that they satisfied these requirements. But they did not advance this argument in their posttrial briefs. See Rule 149(b). In any event, where our conclusions are based (as here) on a preponderance of the evidence, the allocation of the burden of proof with respect to the deficiencies is immaterial. See Foster v. Commissioner, 138 T.C. 51, 53 n.4 (2012); Pederson v. Commissioner, T.C. Memo. 2013-54, 105 T.C.M. (CCH) 1365, 1372.

B.      Allowability of Horse Activity Losses

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." If an activity is not engaged in for profit, no deduction is allowed except to the extent of gross income derived from the activity (reduced by deductions allowable without regard to whether the activity was engaged in for profit). Sec. 183(b). Thus, losses are not allowable for an activity that a taxpayer carries on primarily for sport, as a hobby, or for recreation. Sec. 1.183-2(a), Income Tax Regs.

To be entitled to deductions under section 162(a), the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. See Hulter v. Commissioner, 91 T.C. 371, 392 (1988). The taxpayer's expectation of profit does not have to be reasonable, sec. 1.183-2(a), Income Tax

[*31] Regs., but his intent to make a profit must be genuine. In making this determination we accord greater weight to objective facts than to the taxpayer's subjective assertions. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(a), Income Tax Regs. We determine whether the taxpayer has the requisite intent to earn a profit on the basis of all surrounding facts and circumstances. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.

Section 183(d) has a safe harbor for activities consisting in major part of breeding, training, showing, or racing horses. Such an activity will be presumed to be engaged in for profit if the activity produces gross income in excess of deductions for any two of the seven consecutive years ending with the tax year, unless the Commissioner establishes to the contrary. Sec. 183(d); Donoghue v. Commissioner, T.C. Memo. 2019-71, 117 T.C.M. (CCH) 1352, 1358. Bluestone produced no gross income in excess of deductions for any year from 1998 through 2013, the last tax year in issue. The presumption thus has no application here.

The regulations set forth a nonexclusive list of nine factors relevant in ascertaining whether the taxpayer conducted an activity with the intent to earn a profit. They are: (1) the manner in which the taxpayer conducts the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort spent by the taxpayer

**[\*32]** in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.

No factor or group of factors is controlling, nor is it necessary that a majority of factors point to one outcome. See Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979) (analyzing taxpayer's profit motive "not on the basis of any one factor but on the basis of all the facts and circumstances"); sec. 1.183-2(b), Income Tax Regs. Certain factors may be accorded more weight in a particular case because they have greater salience or persuasive value as applied to its facts. See Vitale v. Commissioner, T.C. Memo. 1999-131, 77 T.C.M. (CCH) 1869, 1874, aff'd without published opinion, 217 F.3d 843 (4th Cir. 2000); Green v. Commissioner, T.C. Memo. 1989-436, 57 T.C.M. (CCH) 1333, 1343 (noting that all nine factors do not necessarily apply in every case). We discuss these factors in turn.

**[*33]** 1.     <u>Manner in Which Activity Is Conducted</u>

"The fact that the taxpayer carries on the activity in a businesslike manner * * * may indicate that the activity is engaged in for profit." Sec. 1.183-2(b)(1), Income Tax Regs. A "businesslike manner" may be suggested by the maintenance of "complete and accurate books and records" and a plausible business plan. <u>Ibid.</u> We also consider whether the taxpayer conducts the activity "in a manner substantially similar to other activities of the same nature which are profitable," and whether the taxpayer changes "operating methods, adopt[s] * * * new techniques or abandon[s] * * * unprofitable methods in a manner consistent with an intent to improve profitability." <u>Ibid.</u>

Bluestone's records were voluminous. They included information about its overall finances and income/expense figures horse by horse. <u>Cf.</u> <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288, 80 T.C.M. (CCH) 358, 367 (explaining that failure to keep track of expenses per horse can imply a lack of profit motive). Bluestone advertised its business, maintained a website, and hired a C.P.A. to prepare its tax returns. <u>See</u> <u>Metz v. Commissioner</u>, T.C. Memo. 2015-54, 109 T.C.M. (CCH) 1248, 1255-1256. It had full-time employees and appears to have filed all necessary employment-related paperwork. It carried mortality insurance on its horses and liability and property damage insurance on its farmland. Bluestone and

[*34] its partners had separate bank accounts. See Morley v. Commissioner, T.C. Memo. 1998-312, 76 T.C.M. (CCH) 363, 364.

But Bluestone's records had important inaccuracies and gaps, particularly as they relate to money. No document in the record specifies the initial financial arrangements between Mitchel and Eric, and they could not remember what their original capital contributions were. Although they regarded themselves as equal partners in 1998, that had changed by 2001. No documentation exists as to how or when that change in ownership occurred, and there is no record of the financial arrangements that led to it. Eric reduced his ownership interest from 25% to 15% in 2007, when Bluestone purchased the Rosenthal Farm. But this change in ownership was not memorialized in writing until 2017, well after the IRS had commenced its examination of petitioners' returns.

When additional capital had to be contributed--often, given Bluestone's mounting losses--most of that capital came from Mitchel. Capital was not contributed proportionately to the partners' ownership interests, and the partners did not distinguish between capital contributions and loans. No partner was ever required to make an additional contribution to keep the relative contributions stable. This is not how for-profit businesses generally operate.

[*35] Having a business plan, written or unwritten, may suggest that an activity is conducted in a businesslike manner. See Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C.M. (CCH) 2296, 2300; sec. 1.183-2(b)(1), Income Tax Regs. Bluestone last prepared a written business plan in 2004. That plan was woefully out of date by 2010. Especially was that so given the 2007 purchase of the Rosenthal Farm, which cost $4 million and more than tripled Bluestone's acreage.

The manner in which Bluestone conducted its activities shows that it was largely insensitive to costs. This insensitivity to costs is apparent from the fact that, for years after 2004, it never had a budget of any kind. It likewise prepared no balance sheets, profit-and-loss projections, or break-even analyses after 2004. Michael Klau, the manager for Southwind Farms, was asked at trial whether his farm had a budget. He replied: "Every business has a budget." See Donoghue, 117 T.C.M (CCH) at 1359 (finding that taxpayers lacked a reasonable business plan where successive plans were virtually identical and either projected a loss or made no projection at all).

Another nonbusinesslike feature was the persistent blending of personal and business elements. See Bronson v. Commissioner, T.C. Memo. 2012-17, 103 T.C.M. (CCH) 1112, 1116 (finding taxpayer's recordkeeping was not businesslike where the entity claimed deductions for personal expenses), aff'd, 591 F. App'x

[*36] 625 (9th Cir. 2015). Mitchel resided at Bluestone Farms throughout the tax years at issue. He and Brianna lived there rent free, but there was never any formal agreement among Bluestone's partners regarding the financial consequences of their doing so.

Those financial consequences were considerable. At Mitchel's direction, the original stone farmhouse was dismantled piece by piece and many of its elements were incorporated into an expanded residence. Mitchel hired an engineering firm to devise plans for the renovation, and Bluestone paid all of that firm's invoices. During 2010-2013 Bluestone paid on the farm properties aggregate mortgage interest exceeding $190,000, aggregate real estate taxes exceeding $225,000, and aggregate utilities expenses exceeding $100,000. Bluestone made no effort to ascertain the portion of these expenses attributable to Mitchel's personal residence, and he did not reimburse Bluestone for any of these outlays. See Whatley v. Commissioner, T.C. Memo. 2021-11, at *20 (finding that farm was not operated in a businesslike manner where taxpayer deducted expenses of "doubtful legitimacy" including depreciation for a personal residence).

During 2011-2013 Bluestone paid aggregate landscaping expenses of $200,340, and about half this landscaping work directly benefited Mitchel's personal residence. Mitchel and Brianna were married at Bluestone in May 2013, and

**[*37]** the landscaping company invoiced Bluestone $35,237 for expenses incurred to improve the property's appearance for the wedding. Mitchel reimbursed Bluestone for none of these outlays.

Brianna transported most of her horses to Bluestone when she moved in with Mitchel, and Bluestone paid all the expenses of caring for her horses. Brianna was given a Bluestone credit card, which she used to buy clothing and other personal items. Mitchel had Bluestone's staff widen and maintain a walking path through the woods solely for Brianna's convenience in riding her horses.

Mitchel made a telling admission at trial when he said: "Because I love Brianna, I don't charge her for any of these horses." It would have been perfectly reasonable for Mitchel to defray out of his own pocket the costs of his wife's equestrian activities. But piling these costs onto Bluestone--already a persistently money-losing business--sits uneasily with Mitchel's assertion that he operated Bluestone with the intent to make a profit.

Against these indicia that he lacked a genuine profit motive, Mitchel emphasizes the meticulousness of Bluestone's recordkeeping. Although Bluestone's records were far from perfect, see supra pp. 19-20, they were concededly voluminous. But we think petitioners misapprehend the relevance of recordkeeping in the

**[*38]** section 183 inquiry. Although the absence of records may show the lack of profit motive, the presence of records does necessarily not show the opposite.

All taxpayers are required to keep "such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters" required to be shown on their tax returns. Sec. 1.6001-1(a), Income Tax Regs. Maintaining books and records--without more--tells us little about the taxpayer's motivation. Regardless of whether he has a profit motive, a taxpayer must maintain books and records to substantiate his losses.

Petitioners emphasize that Bluestone maintained, not only general financial records, but also detailed records pertaining to each horse. But many hobbyists maintain meticulous records about the subjects of their interest. Wine enthusiasts may keep detailed records about every bottle of wine in their cellars, including date of purchase, acquisition price, tasting notes, and anticipated period of drinkability. Bird watchers may keep detailed records of every species they observe, including date and time of viewing, location, topography, and prevailing weather conditions. Maintaining such records does not mean that the person is engaging in the activity with the intent to make a profit. It just shows that he or she is a serious hobbyist as opposed to a careless amateur.

[*39] For section 183 purposes, the key question is not whether the taxpayer keeps records, but whether the taxpayer uses his records to improve profitability and implement techniques for controlling expenses and increasing income.  As we stated many years ago:  "The purpose of maintaining books and records is more than to memorialize for tax purposes the existence of the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner."  Burger v. Commissioner, T.C. Memo. 1985-523, 50 T.C.M. (CCH) 1266, 1271, aff'd, 809 F.2d 355 (7th Cir. 1987); see Golanty, 72 T.C. at 430 ("[T]he keeping of books and records may represent nothing more than a conscious attention to detail * * * [unless the taxpayer] show[s] that she used them to improve the operation of the enterprise.").

Petitioners presented no evidence that Bluestone used its records, after 2004, to develop plans to reduce expenses or otherwise bring the farm into profitability. Indeed, Mitchel made several damaging admissions about his insensitivity to costs. When asked why he did not pursue cost-cutting recommendations offered by his staff, he said that he did not look at his horse activity "in terms of income and expenses."  And when asked why Bluestone paid for landscaping expenses that bene-

[*40] fited him and his personal residence, he characterized them as "minor costs" to which his partners would not object because he owned 70% of Bluestone.

Petitioners assert that they made some changes with a view to increasing Bluestone's income, such as partnering with Cane Run Farms. Mitchel testified, for example, that the average price of Bluestone's yearlings increased after it started partnering with Cane Run. But Bluestone's general ledgers show that its overall yearling sales decreased from $484,000 in 2010 to $299,085 in 2013.

Petitioners contend that Bluestone tried to increase income by racing more horses and boarding horses in other States to take advantage of breeder's awards. But petitioners ignore the offsetting costs of these actions. Mitchel admitted that racing horses was risky, and (according to Bluestone's ledgers) its racing expenses exceeded its racing income for every year at issue. Boarding horses at farms in other States was expensive, and petitioners failed to establish any offsetting reductions in the cost of operating Bluestone's own properties. And the income Bluestone received from breeder's awards was relatively insignificant, apparently unimportant enough that Bluestone did not track this income consistently in its financial records. See McKeever, 80 T.C.M. (CCH) at 367 ("[P]etitioners have not convinced us that the changes had or will have a material impact on their horse activity's profitability[.]").

[*41] More telling in our view are the changes to operating procedures that petitioners did not make. See sec. 1.183-2(b)(1), Income Tax Regs. ("[A]bandonment of unprofitable methods in a manner consistent with an intent to improve profitability may * * * indicate a profit motive."). Bluestone purchased the Rosenthal Farm for $4 million in 2007. By 2010-2013 it was obvious that this 200-acre property was wholly unnecessary to Bluestone's horse-breeding business. The conventional wisdom in the Standardbred industry is that owners need roughly two acres of land per horse. During 2010-2013 the number of horses physically present at Bluestone (including retired horses with no economic value) usually ranged between 20 and 25. Bluestone's original farm property, comprising 60 acres, was more than enough to accommodate this herd. And because of competitive pressures from neighboring States, expanding the size of the resident herd made no economic sense.

Bluestone could have generated income, reduced costs, and rationally downsized its operations by selling the Rosenthal Farm. But it declined a 2012 offer from a major developer to purchase that farm, as well as the Wert Farm. And having chosen to keep the Rosenthal Farm, it made no serious effort to generate income from the land. Mitchel allowed a friend to grow hay on 100 acres for free. An employee's son was permitted to use the barn to store equipment for his land-

[*42] scaping business, again for free. In 2013 Bluestone was approached by a land preservation group that offered to purchase the building rights on the farmland. It declined that offer as well.

Mitchel and Eric clearly wanted to have a high-quality horse-breeding operation, and they spent generously to demonstrate that they were serious players in the Standardbred universe. But we find little evidence that they conducted this activity in a "businesslike manner," i.e., in a manner intended to generate a profit. Many hobbyists desire to have a high-quality activity, but that does not necessarily mean that profit making is their goal. We regard this first factor as important in our analysis, and we find that it strongly favors respondent.

### 2. Expertise of the Taxpayers or Their Advisers

Consulting with industry experts and studying accepted business practices when preparing for an activity may suggest a profit motive. See sec. 1.183-2(b)(2), Income Tax Regs. Both Mitchel and Eric had experience investing in horses, including through Chancery Equine Group. Mitchel also had several years' experience working at his parents' Southwind Farm, a respected Standardbred horse operation. Petitioners consulted with leading experts in the industry, including Robert Boni, the bloodstock agent; Elizabeth Caldwell, the manager of Cane Run Farms; and trainers Bob Stewart and Joe Halloway.

[*43] Significantly, the record does not indicate what type of advice petitioners sought from their advisers. For section 183 purposes, the most relevant advice concerns how to profit from the activity, not just how to conduct the activity well. See Whatley, at *20-*21; Heinbockel v. Commissioner, T.C. Memo. 2013-125, 105 T.C.M. (CCH) 1733, 1739 (finding that taxpayer lacked a profit motive where he consulted aircraft experts but produced no evidence of discussions with aircraft experts or other advisers "about the potential profitability of the aircraft"). Given petitioners' previous experience in the Standardbred industry and the number and quality of the people they consulted, this factor favors petitioners. But because serious hobbyists, no less than profit-motivated entrepreneurs, often seek expert advice about the subjects of their interest, we accord this factor relatively little weight.

3.      Taxpayers' Time and Effort

A taxpayer's devotion of considerable time and effort to an activity may indicate a profit motive, "particularly if the activity does not have substantial personal or recreational aspects." Sec. 1.183-2(b)(3), Income Tax Regs. Intention to derive a profit may also be supported by the taxpayer's "withdrawal from another occupation to devote most of his energies to the activity." Ibid. Even where a taxpayer himself devotes limited time to an activity, a profit motive may be indicated

**[\*44]** if he "employs competent and qualified persons to carry on such activity." Ibid.

Although Mitchel testified that he worked "between five and six days a week," the testimony of his employees convinced us that he was not much of a hands-on manager. His role was mostly limited to office tasks and high-level supervision. Eric spent six months in Florida and visited the farm only occasionally during the rest of the year. His role was generally limited to watching races, attending social events, and giving advice. Bluestone's staff members knew what their jobs were, created their own schedules, and did their work with minimal oversight.

Mitchel and Eric did not ride horses recreationally. But they clearly derived personal enjoyment from the work they chose to do, as well as from the social opportunities and status in the Standardbred community that participation in Bluestone afforded them. They avoided most of the unpleasant aspects of running the farm, like cleaning the stalls and maintaining the grounds. Cf. Morley, 76 T.C.M. (CCH) at 365 (describing how the taxpayer's horse activity forced him to spend less time with his family and caused him to get home "after dark, very tired, in a bad mood, and dirty with a 'certain aroma' from his work on the farm").

[*45] Mitchel withdrew from his IT consulting firm shortly after founding Bluestone, but when he left he expected to receive substantial funds from his parents. Around 2003 he began receiving distributions from a trust fund in increments of several million dollars. By 2010 he had received roughly $10 million from his parents' trust. Although he withdrew from his former occupation to devote his energies to horse breeding, we do not give that fact much weight in determining whether he intended to profit from this activity. Under the circumstances his withdrawal suggests the desire for a comfortable retirement, not a compulsion to roll up his sleeves in an effort to make a living from breeding horses.

That said, Bluestone employed between 7 and 10 staff members during the years at issue, several of them full time. The evidence suggested that they were all competent and qualified for their jobs. On balance, we regard this third factor as neutral.

4. Expectation of Appreciation in Value

A profit motive may be indicated if a taxpayer expects that assets used in the activity will appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. Petitioners maintain that they expected both Bluestone's farmland and its horses to appreciate. Mitchel testified to his belief that both have in fact appreciated and that, if Blue-

**[\*46]** stone were liquidated, the proceeds would be more than sufficient to offset all of Bluestone's past losses.

### a.     Appreciation in Value of Land

The regulations recognize that "[t]he term 'profit' encompasses appreciation in the value of assets, such as land, used in the activity." Ibid.  Thus, a taxpayer may intend that, "even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation." Ibid.  The regulations caution, however, that we must consult section 1.183-1(d), Income Tax Regs., "for [the] definition of an activity in this connection."

The latter regulation provides that, "[w]here land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land." Sec. 1.183-1(d)(1), Income Tax Regs. (emphasis added).  This final condition is satisfied only if the taxpayer shows that "the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land." Ibid.  Deductions

**[*47]** directly attributable to holding the land include "interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land." Ibid.

In short, where land is held primarily with the intent to profit from its appreciation, the farming activity is deemed to be separate from the land-holding activity unless the taxpayer shows that the farming generated net income after eliminating expenses directly attributable to carrying the land. Although this formula seems complicated, its purpose seems clear. A taxpayer obviously can profit from land appreciation without engaging in a separate activity (such as horse breeding) that loses a lot of money. Thus, the land holding is treated as a separate activity from the farming unless the latter benefits the former. That benefit exists only if the farming activity (ignoring landholding-specific expenses) generates net income that "reduces the net cost of carrying the land." Ibid.; see, e.g., Burrus v. Commissioner, T.C. Memo. 2003-285 (concluding that cattle operation and land holding were separate activities); Hambleton v. Commissioner, T.C. Memo. 1982-234 (concluding that farming and land holding were separate activities).

Whatever may have motivated Bluestone to purchase the Wert and the Rosenthal Farms in 2002 and 2007, respectively, we find that Bluestone during 2010-2013 held both properties "primarily with the intent to profit from increase in

**[\*48]** * * * [their] value." See sec. 1.183-1(d)(1), Income Tax Regs. Both farms, which were some distance from the original property, were severely underutilized during 2010-2013. Because of petitioners' arrangement with Cane Run Farm and their increasing propensity to board their horses in other States, the number of horses actually living at Bluestone Farms declined substantially. During 2010-2013 the number of horses physically present at Bluestone (including retired horses of no economic value) ranged from 20 to 25. Given the conventional wisdom that owners need roughly two acres of land per horse, Bluestone's original property, comprising 60 acres, was more than enough to accommodate this herd.

Recognizing these facts, Bluestone in 2011 took steps to investigate sale of the Wert and the Rosenthal Farms. It retained an engineering firm to prepare a topographical survey and a feasibility study that addressed subdivision and development of the two farms. It hired a law firm to assist with the technical aspects of subdividing the properties. In 2012 it entertained an offer from Toll Brothers to purchase the 230 acres making up the Wert and the Rosenthal Farms, but no sale was consummated because Mitchel and Eric held out for a higher price. Considering all these facts, we find that Bluestone during 2010-2013 held the Wert and the Rosenthal Farms "primarily with the intent to profit from increase in * * * [their] value." See id.

[*49] As a result, Bluestone's farming activity and its activity of holding these 230 acres for appreciation are considered separate activities for section 183 purposes unless petitioners meet the above-stated requirements of section 1.183-1(d)(1), Income Tax Regs. They cannot possibly make this showing. During 2010-2013 Bluestone had net farming losses that exceeded $3.5 million. Its principal deductions "directly attributable to the holding of the land," ibid., were mortgage interest and real estate taxes, which totaled about $415,000, see supra p. 14. Bluestone during these years claimed minimal depreciation on land improvements, apart from depreciation on Mitchel's residence.

In short, Bluestone's expenses attributable to its 2010-2013 farming activity (excluding landholding-specific expenses) exceeded its income from farming activity by roughly $3 million. In no sense, therefore, did "the farming activity reduce[] the net cost of carrying the land for its appreciation in value." See sec. 1.183-1(d)(1), Income Tax Regs. Bluestone's horse-breeding activity is accordingly deemed a distinct and independent activity from its activity of holding the Wert and the Rosenthal Farms for appreciation. Petitioners' expectation that these 230 acres would appreciate in value is thus irrelevant in determining whether they engaged in their horse-breeding activity with the intent to make a profit.

[*50] On the other hand, we agree with petitioners that the original 60-acre property, purchased in 1998, was held during 2010-2013 primarily for use in Bluestone's horse-related activity. Holding that land and breeding the horses was a single "activity," given the high degree of "organizational and economic interrelationship" between the two. See ibid. Petitioners' expectation that the original property would appreciate in value may thus be considered in assessing the existence of a profit motive.

Bluestone purchased the original property for about $550,000, and by 2010 it had appreciated by $3.19 million, or $265,000 per year. Part of that appreciation was attributable to the renovation and landscaping of Mitchel's residence and should therefore be excluded. See Barter v. Commissioner, T.C. Memo. 1991-124, 61 T.C.M. (CCH) 2198, 2200 ("[T]he improvements * * * added are properly identified as personal and, therefore, do little to help * * * [the taxpayer's] case."), aff'd without published opinion, 980 F.2d 736 (9th Cir. 1992). But even if that adjustment is not made, the annual real estate appreciation was dwarfed by Bluestone's annual operating losses, which ranged from $500,000 to $1.4 million. An expectation of real estate appreciation therefore does not support a finding that petitioners' horse activity as a whole was conducted with the genuine intent to make a profit.

**[\*51]**  b.  <u>Appreciation in Value of Horses</u>

Petitioners contend that they also expected their horses to appreciate in value. In an effort to show such appreciation they sought to introduce into evidence the expert testimony of David Reid. The substance of Mr. Reid's report consisted of two spreadsheets: One listed horses owned by Bluestone in August 2010 and the other listed horses owned by Bluestone in August 2017. In the final column of each spreadsheet Mr. Reid listed an "appraised value" for Bluestone's interest in each horse. But he supplied no explanation whatever of how he derived these values. We concluded that "the totality of his 'appraisal' of each horse is simply a number inserted into a box on a spreadsheet." <u>Skolnick I</u>, 117 T.C.M. (CCH) at 1321. Finding that Mr. Reid's report did not "rest[] on a reliable foundation," <u>see</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993), we excluded the report from evidence under Rule 143(g) and Rule 702 of the Federal Rules of Evidence, <u>see</u> <u>Skolnick I</u>, 117 T.C.M. (CCH) at 1321-1322.

An expectation of future appreciation is inherently speculative, but it "becomes less speculative when a taxpayer shows successes that could plausibly lead to appreciation." <u>Annuzzi v. Commissioner</u>, T.C. Memo. 2014-233, 108 T.C.M. (CCH) 533, 538 (citing cases). To support their belief that the value of Bluestone's equine assets would increase, petitioners rely chiefly on Mitchel's trial tes-

[*52] timony. But he was unable to cite many past successes pointing meaningfully in the right direction.

Mitchel and Eric had been trying to breed or pick exceptional horses since 1998, but without much luck. Their first big success at identifying a horse that ended up having a value vastly exceeding its cost was Always B Miki. Bluestone purchased a 35% interest in that horse for $50,000 in 2013. Although Always B Miki achieved his greatest victories after the last tax year in issue, petitioners allegedly believed from the outset that this horse would be wildly successful.

Taking that belief at face value, we do not think it helps petitioners' case. Bluestone owned full or partial interests in hundreds of horses between 1998 and 2013, and it lost more than $11 million in that endeavor. One horse's success, achieved largely after the tax years at issue, is simply not a plausible basis on which to found an expectation that Bluestone's herd of horses, as a whole, would meaningfully increase in value over time. More plausible was the testimony of respondent's expert, John Daniel Curtin, who credibly testified that, in his estimation, the value of Bluestone's broodmares declined from roughly $860,000 in 2010 to $525,000 in 2013.

In sum, we find that the expectation that the relevant real estate and/or Bluestone's herd of horses would appreciate in value does not support a finding that

[*53] petitioners' horse activity as a whole was conducted with the genuine intent to make a profit. This fourth factor is therefore neutral at best.

5.      Success of the Taxpayer in Carrying On Other Similar Activities

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit." Sec. 1.183-2(b)(5), Income Tax Regs. Mitchel's previous career was in software, and Eric's was in insurance. While starting any business shows an entrepreneurial inclination, there is no evidence that their success in these prior endeavors was any predictor of success in horse breeding. See Whatley, at *26-*27 (finding this factor neutral where taxpayer who owned a cattle farm previously worked in the banking and logging industries). Nor is there any evidence that Mitchel or Eric was a "turnaround expert" skilled at reforming an unprofitable business into a profitable one. See Easter v. Commissioner, T.C. Memo. 1992-188, 63 T.C.M. (CCH) 2590, 2595 (finding no evidence of taxpayer's having previously turned around a money-losing business). We view this factor as neutral.

6.      History of Income or Losses

Long periods of losses following the initial startup phase can indicate the lack of a profit motive. See sec. 1.182-2(b)(6), Income Tax Regs. This inference

**[*54]** may not arise where losses are due to "customary business risks or reverses" or to "unforeseen or fortuitous circumstances which are beyond the control of the taxpayer." Ibid. Such fortuitous circumstances include "drought, disease, fire, theft, weather damages, * * * or depressed market conditions." Ibid.

Bluestone's losses were large and sustained. Petitioners lost more than $11.4 million between 1998 and 2013 without a single profitable year. We have previously held that the startup phase for a horse-breeding activity is 5 to 10 years. See Engdahl, 72 T.C. at 669; Donoghue, 117 T.C.M. (CCH) at 1360; McKeever, 80 T.C.M. (CCH) at 371. But Bluestone's losses did not stop after 5 or even 10 years. During the tax years at issue, after 12 years of operation, Bluestone lost more than $3.5 million.

Petitioners cannot explain these losses by pointing to unexpected adverse events. Petitioners lean heavily on the 2008 financial crisis. But while Bluestone's losses in 2008-2010 were large ($3,063,893), its losses in 2011-2013, when the economy was recovering, were only slightly smaller ($2,993,873). New Jersey's governor terminated a subsidy to the New Jersey horse industry in 2012. But the elimination of that subsidy does not explain the magnitude of Bluestone's loss in 2012 ($993,066) or the magnitude of its losses in earlier years when the subsidy existed.

[*55] Bluestone continued to be unprofitable following the tax years at issue, reporting for 2014-2017 ordinary business losses of $3,160,703. When section 1231 gains are factored in, Bluestone managed a small profit in 2016 ($281,450) by selling a 25% share in its most successful horse, Always B Miki. We give this fact little weight for three reasons. First, this profit occurred three years after the last tax year in issue. Second, this profit was small relative to Bluestone's losses in other years, which often exceeded $1 million. Third, the IRS selected Mitchel and Leslie's 2012 return for examination in 2014. Petitioners thereafter had an incentive to take extraordinary measures to generate a profit.

This sixth factor strongly favors respondent. We view it as by far the most important factor on the facts of these cases, and we accord it great weight in our analysis.

### 7. Amount of Occasional Profit

A taxpayer's derivation of some profits from an otherwise money-losing venture may support the existence of a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs. But "[a]n occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit."

[*56] Ibid. Petitioners did not derivate any profit from Bluestone from its founding in 1998 through the end of 2013, the last year in issue.

In the absence of actual profits, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit." Ibid. We have previously found certain horse activities--especially racing activities--to be highly speculative ventures, even likening them to wildcat oil drilling ventures. See Annuzzi, 108 T.C.M. (CCH) at 539; Dawson v. Commissioner, T.C. Memo. 1996-417, 72 T.C.M. (CCH) 624, 627.

Bluestone focused most of its effort on breeding, as opposed to racing, Standardbred horses. And many of its top prospects, including Always B Miki and the horses that Cane Run Farms prepared for sale, were jointly owned. If one of these horses ended up generating exceptional income, that income would have been shared with the other owners. When Bluestone sold a 25% share of Always B Miki in 2016, that sale generated only a small net profit.

We are not persuaded that petitioners entertained a reasonable belief, during 2010-2013, that the outsized success of a few horses would make Bluestone profitable overall. This factor likewise favors respondent.

[*57] 8.     Taxpayer's Financial Status

The fact that a taxpayer has substantial income or capital at his disposal from sources other than the activity in question may indicate that he does not engage in that activity for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.  This is especially true if "the losses from the activity generate substantial tax benefits" and "if there are personal or recreational elements involved."  Ibid.

Neither Mitchel nor Eric relied on Bluestone for financial support.  During 2010-2013 Mitchel's joint returns reported gross income from sources other than Bluestone--chiefly investment income--totaling more than $3.5 million.  Although Mitchel had not begun receiving money from his parents when he founded Blue-stone, he expected that large sums lay on the horizon.  He began receiving multi-million-dollar distributions from his parents' trust during the mid-2000s, around the time Bluestone stopped preparing budgets and business plans.  By 2010 he had received about $10 million from the trust.

By claiming large annual losses from Bluestone for 2010-2013, petitioners reduced their tax liabilities to zero or near zero for each year.  They also generated (as they had done previously) substantial NOLs that they hoped would shelter their future investment income.  These losses conferred substantial tax benefits on peti-tioners.  And as we discuss next, petitioners' Standardbred activity had "personal

**[\*58]** or recreational elements involved." Ibid. For all these reasons this eighth factor strongly favors respondent. Cf. id. para. (c), Example (1) (suggesting that farming activity may not be engaged in for profit where farm "had substantial losses in each year," taxpayer had "substantial stock holdings which yield[ed] large income from dividends," and taxpayer lived in an area of the farm set aside for residential purposes).

9.      Elements of Personal Pleasure or Recreation

The fact that a taxpayer derives personal pleasure from an activity, or finds it recreational, may suggest that he engages in it for reasons other than making a profit. Id. para. (b)(9). That does not mean that a business becomes a hobby just because the taxpayer enjoys it. As we have said, "suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972). That said, "where the possibility for profit is small * * * and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity." Dodge v. Commissioner, T.C. Memo. 1998-89, 75 T.C.M. (CCH) 1914, 1919 (quoting Burger, 50 T.C.M. (CCH) at 1272-1273), aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999).

Mitchel and Eric enjoy buying, selling, breeding, and racing Standardbred horses. See sec. 1.183-2(c), Example (3), Income Tax Regs. (noting that the activ-

**[*59]** ity of raising and racing horses "is of a sporting and recreational nature").

The evidence at trial convinced us that the pleasure they derived from these

activities, rather than any hope of making a profit, accounted for their persistence

in subsidizing Bluestone's continuous losses.

Although Brianna rode horses recreationally, Mitchel did not. But Mitchel

clearly enjoyed the analytical challenges of horse breeding, which drew on skills

he had developed in the computer industry. Eric enjoyed going to races, betting on

horses, and attending social functions. By spending millions of dollars to develop

a high-quality breeding operation, Mitchel and Eric established themselves as

major players in the Standardbred world. They clearly enjoyed the status they thus

achieved, which offered opportunities to socialize with other horse owners and

meet top professionals in the field. See Taras v. Commissioner, T.C. Memo. 1997-

553, 74 T.C.M. (CCH) 1388, 1395 (finding that the major reason the taxpayers

owned horses was the "enjoyment of being engaged in horse racing and breeding,"

even though they did not ride horses), aff'd without published opinion, 187 F.3d

627 (3d Cir. 1999).

Mitchel's residence in a renovated stone farmhouse on the property en-

hanced his enjoyment. Bluestone defrayed the engineering costs of renovating the

building and paid the mortgage interest, real estate taxes, and utilities expense

[*60] attributable to it. Bluestone paid the expenses of landscaping, not only the immediate environs of Mitchel's residence, but also the adjacent areas. Bluestone paid the costs of excavating and building drainage systems, bringing in boulders, creating a waterfall, and restoring several ponds. Brianna enjoyed riding her horses on the property. And Mitchel enjoyed watching his horses graze on the grounds of a large and impressive estate. We conclude that this final factor favors respondent. Cf. sec. 1.183-2(c), Example (3), Income Tax Regs. (suggesting that horse activity that lost money for 15 years was not engaged in for profit where the taxpayer "had substantial income from his business activities," lived with his family on the farm, and "race[d] his horses only at the 'prestige' tracks" that offered social and recreational opportunities).

As we have said in prior cases, determining profit motive under section 183 is not a matter of toting up factors but requires evaluating all the facts in a qualitative sense. See, e.g., Whatley, at *15. We conclude that four factors listed in the regulations have the greatest salience and importance given the circumstances of these cases--the manner in which the activity was conducted, the history of losses, the taxpayers' financial status, and the elements of personal pleasure or recreation. All four of these factors strongly favor respondent. Only one factor favors petitioners--the expertise of the taxpayers and their advisers--and we give it little

[*61] weight on the facts here. Considering all the relevant facts and circumstances, we conclude that petitioners did not conduct Bluestone's horse activity during 2010-2013 with a genuine intent to make a profit. Section 183 thus disallows as deductions the losses that Bluestone passed through to them.

C.      Net Operating Losses

Petitioners' horse activity generated NOLs in years before 2010. Unable to use the NOLs fully in prior years, petitioners seek to carry them forward to the years at issue as deductions under section 172(b)(1)(A). A taxpayer claiming an NOL deduction bears the burden of establishing both the existence of the NOL and the amount of any loss that may be carried over to the subject years. Rule 142(a)(1); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955); Green v. Commissioner, T.C. Memo. 2003-244, 86 T.C.M. (CCH) 273, 274-275.

Where (as here) the alleged NOLs were incurred by a pass-through entity, the taxpayer must prove at the very least that (1) the entity incurred NOLs, (2) he had a sufficient basis in the entity to absorb the NOLs, and (3) the NOLs were properly carried forward to the years at issue. See Jasperson v. Commissioner, T.C. Memo. 2015-186, 110 T.C.M. (CCH) 304, 306, aff'd, 658 F. App'x 962 (11th Cir. 2016). Taxpayers cannot rely solely on their own income tax returns to estab-

[*62] lish that losses were actually sustained.  See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Power v. Commissioner, T.C. Memo. 2016-157, 112 T.C.M. (CCH) 241, 245.  We may consider facts relating to years not in issue that are relevant to the claimed NOLs.  Sec. 6214(b).

Petitioners rely on the following evidence to substantiate their claim to NOL carryforwards:  (1) their Forms 1040, U.S. Individual Income Tax Return, for 2010-2013; (2) Bluestone's Forms 1065 for 1998-2013; (3) the "no change" letter that the IRS issued Bluestone in 2010, following an examination of its 2008 partnership return; and (4) Bluestone's general ledgers for 2010-2013.  This is insufficient substantiation.  Petitioners' tax returns merely set forth their claims to NOLs and do not establish their entitlement thereto.  See Roberts v. Commissioner, 62 T.C. 834, 837 (1974).  The 2008 audit of Bluestone's return did not address whether petitioners operated that entity with the intent to make a profit; in any event, every tax year stands on its own.  See United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969); ATL & Sons Holdings, Inc. v. Commissioner, 152 T.C. 138, 147 (2019).  And the 2010-2013 general ledgers include data only for those years.[5]

---

[5] Five months after we closed the record in these cases, petitioners moved to reopen the record to admit additional evidence regarding their claim to NOL carry-forward deductions.  We denied that motion as untimely.

**[\*63]** We have already determined that petitioners did not operate Bluestone with an intent to profit during 2010-2013, and those general ledgers have no relevance to earlier periods.

D.    Addition to Tax

The notice of deficiency determined that petitioners Mitchel and Leslie Skolnick were liable for an addition to tax for 2010.[6]  Section 6651(a)(1) imposes an addition to tax for failure timely to file a return unless the taxpayer establishes that the failure was due to "reasonable cause and not due to willful neglect." United States v. Boyle, 469 U.S. 241, 245 (1985).  The Commissioner bears the initial burden to introduce evidence that the return was filed late.  See sec. 7491(c). The taxpayer then bears the burden of proving that the late filing was due to reasonable cause and not willful neglect.  Boyle, 469 U.S. at 245; Higbee v. Commissioner, 116 T.C. 438, 447 (2001).  The parties agree that the 2010 return was filed about a year late.  Petitioners accordingly must prove that the untimely filing was

_____

[6] Respondent argues that Mitchel and Leslie should be deemed to have conceded the addition to tax (as well as the accuracy-related penalties) because they did not sufficiently assign error to these items in their petitions.  We disagree.  The petitions showed that petitioners disagreed with imposition of the addition to tax and the penalties because they contested the total amounts of the deficiencies.  At that point in the proceeding, their pleading was sufficient.  See Wheeler v. Commissioner, 127 T.C. 200, 207 (2006) (finding that the Commissioner was on notice even though "the petition is unclear in many respects and does not follow the format that Rule 34(b) requires"), aff'd, 521 F.3d 1289 (10th Cir. 2008).

**[\*64]** due to reasonable cause and not willful neglect.  See Rule 142(a); Higbee,

116 T.C. at 446-447.

The 2010 return was prepared by Mr. Nathan, Mitchel's C.P.A.  The evidence established that he deferred preparation of that return until after the filing deadline because he was busy with other work.  He explained that filing the return was not a priority because he thought there was no balance due.

Mitchel and Leslie contend that they should be excused from their late filing because they relied on Mr. Nathan's advice.  This argument is a nonstarter.  Taxpayers have a personal and nondelegable duty to file their tax returns on time.  See Boyle, 469 U.S. at 249 ("Congress intended to place upon the taxpayer an obligation to ascertain the statutory deadline and then to meet that deadline[.]").  There is a narrow exception to this rule where a taxpayer receives advice from an accountant or attorney (for example) that no return is required to be filed.  See id. at 250.  But Mr. Nathan did not advise petitioners that no return needed to be filed; indeed, he gave them no advice on this point.  He deferred preparation of the return because he did not think it was a priority, believing (incorrectly) that his clients had no tax liability for 2010.  Petitioners have not established reasonable cause for the late filing.  See Jackson v. Commissioner, 864 F.2d 1521, 1527 (10th Cir. 1989) ("[A] presumed expert's advice concerning the amount of tax owed can be

[*65] erroneous, and the taxpayer must bear the risk of that error when he fails to comply with a known duty to file a return."), aff'g 86 T.C. 492 (1986); Russell v. Commissioner, T.C. Memo. 2011-81, 101 T.C.M. (CCH) 1363, 1367.

E.    Accuracy-Related Penalty

Section 6662(a) imposes a 20% penalty on the portion of any underpayment of tax attributable to "[n]egligence or disregard of rules and regulations" or "[a]ny substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). Negligence includes "any failure to make a reasonable attempt to comply" with the internal revenue laws. Sec. 6662(c). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of any individual for any penalty. See Higbee, 116 T.C. at 446. The Commissioner must also show that he complied with the procedural requirements of section 6751(b)(1). See sec. 7491(c); Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Once the Commissioner meets his burden of production, the taxpayer bears the burden of proving that the Commissioner's determination is incorrect. Higbee, 116 T.C. at 446-447.

[*66] Section 6751(b)(1) provides that no penalty shall be assessed unless "the initial determination" of the assessment was "personally approved (in writing) by the immediate supervisor of the individual making such determination." The initial determination to impose the penalties was made by RA Krause on March 18 and 20, 2015. On March 23, 2015, the IRS mailed a 30-day letter to each petitioner. Each letter included a RAR, which constituted the first formal communication to petitioners of the IRS' determination to assert penalties. See Clay v. Commissioner, 152 T.C. 223, 249 (2019), aff'd, 990 F.3d 1296 (11th Cir. 2021). Group Manager Grosso, the immediate supervisor of RA Krause, signed each 30-day letter before it was mailed. This is sufficient to show that the IRS complied with the requirements of section 6751(b). See Belanger v. Commissioner, T.C. Memo. 2020-130, 120 T.C.M. (CCH) 198, 205.

A taxpayer generally is not liable for an accuracy-related penalty if he shows that that there was "reasonable cause" for the underpayment and that he acted in good faith. Sec. 6664(c)(1). This determination is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may indicate reasonable cause and good faith include reliance on the advice of a professional. Ibid. To mount this defense successfully the taxpayer must show that: (1) the adviser was a competent profes-

[*67] sional with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Mr. Nathan has prepared Bluestone's and Mitchel's tax returns for at least two decades. He is a C.P.A., has an M.B.A., and has worked as an accountant for many years. His firm had prepared returns for two other horse farms before working with Bluestone. Mr. Tomlinson, also a C.P.A., has a master's degree in accounting, has worked as an accountant since 1974, and has prepared Eric's returns since 1998.

Mitchel provided Mr. Nathan with a copy of Bluestone's general ledger and other documents as requested. Eric provided Mr. Tomlinson with a copy of the Schedule K-1 that Bluestone issued to him and all other relevant documents. Both preparers spoke to Mitchel and Eric about their roles at Bluestone and Bluestone's overall operations and advised them that Bluestone's losses were properly deductible. We find that petitioners relied on this advice in good faith. They therefore are liable for no accuracy-related penalties.

**[\*68]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.